UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AMORY BOOKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-10717-LTS |
| | ) | |
| ROBERT HIERHOLCER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The defendant, Robert Hierholcer, submits this memorandum in support of the accompanying motion for summary judgment pursuant to Fed.R.Civ.P. 56.

## INTRODUCTION

This is damages suit under 42 U.S.C. § 1983 brought by Amory Booker ("Booker"), who alleges that he sustained serious bodily injury during his civil commitment to the Massachusetts Alcohol and Substance Abuse Center ("MASAC"), a facility of the Massachusetts Department of Correction ("Department") then located in Bridgewater. The defendant is correction officer Sgt. Robert Hierholcer. Second. Am. Compl. ¶ 2 (Doc. #20) Booker's allegations are summarized as follows: On November 4, 2016, the Boston Municipal Court civilly committed Booker to MASAC for detoxification pursuant to G.L. c. 123, § 35. Id. ¶ 4. On November 7, 2016 Booker told a MASAC mental health clinician that he did not want to be housed in the "Alpha" unit, an open unit with "communal bunks," where he had been "verbally and physically harassed" presumably by other civilly committed persons, during his previous commitment two weeks earlier. Id. ¶ 5. Booker alleges that the harassment ranged from pulling off his sheets, spitting in his face and calling him racial slurs.

On November 13, 2016, Booker was twice assaulted in the Alpha Unit by civilly committed persons.[1] The first assailant is identified as "JG" and the second as "JN." Id. ¶ 6. JG assaulted Booker after the morning count while Booker sat on the toilet. Id. Booker did not inform staff. Id. Later that day, a second individual, JN, assaulted Booker while Booker sat on his bunk. Id. Booker then was sent to the Delta Unit, an "infirmary/detox" unit, where he told a nurse about the earlier assault by JG. He explained that he had not reported the earlier assault to Department staff because he feared for his safety. Id.

On November 14, 2016, JC, who had assaulted Booker the previous morning, told Sgt. Hierholcer that "[i]t's no secret that I broke my hand on … Booker's face. I'm getting out of this cell in the morning, and if he's still here (Delta Unit), there is gonna be a problem." Id. ¶ 7. As noted below, Sgt. Hierholcer notified other staff and issued a report. Ex. 1, Hierholcer Dep. (12:21 to 15:16; 20:10-13)

On November 17, 2016, Booker was assaulted in the Delta Unit by a third individual, DD. Sgt. Hierholcer's report describes the incident as follows:

> While approaching the Delta 2 bathroom during a security round, I heard a verbal confrontation begin between two civil commitments. As I turned around to identify the two individuals, I heard CC Booker state "You can't hit me. After this statement was made, I witnessed CC DD strike CC Booker with a closed cheek in the left cheek area.

Id. ¶ 8. As a result of the third assault, Booker suffered multiple facial fractures "multiple facial fractures," which necessitated his hospitalization at Morton Hospital in Taunton and then at the Boston Medical Center. Id. ¶ 10. A CT scan revealed a left zygomaticomaxillary complex fracture with required open reduction internal fixation to repair. Id.

---

[1] Initials are substituted for of the names of Booker's assailants in this memorandum and in the deposition transcripts attached as exhibits hereto.

Booker alleges that MASAC correction officers had a "custom" of allowing inmates to "fight it out" in order to settle disputes and punish inmates perceived to be snitches. Id. ¶ 9. He alleges that Sgt. Hierholcer allowed DD to attack Booker because Booker was perceived to be a snitch. Id. Booker alleges that Sgt. Hierholcer violated his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment rights to equal protection and due process by acting with deliberate indifference to a serious risk of bodily injury to Booker by encouraging inmates to "fight it out," and by allowing white inmates to beat him because he was a "snitch" and unwilling or unable to defend himself. Id. ¶¶ 13, 15.

Sgt. Hierholcer denies Booker's allegations of misconduct. Answer to Second Amended Complaint, ¶ 9 (Doc. #28).

Booker seeks compensatory and punitive damages, along with attorney's fees and costs. Sgt. Hierholcer opposes these requests and for the reasons below, moves that summary judgment enter in his favor.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Sgt. Robert Hierholcer submits this statement of undisputed material facts.

### Facts Pertaining to Sgt. Robert Hierholcer

1.      Sgt. Robert Hierholcer served as the MASAC locksmith, armorer and tool control officer. He was responsible for key control, fixing locks, tool inventories, armory equipment, radios and handcuffs. Ex 1 Hierholcer Dep. (18:9 to 18:19).

2.      Sgt. Hierholcer did not ordinarily "work the housing units." During the period of Booker's admission, Sgt. Hierholcer worked overtime in the Delta Unit on only two dates, November 14, 2016 and November 17, 2016. Hierholcer Dep. (18:20 to 19:17).

**Facts Pertaining to the November 13, 2016 Assault by JG in the Alpha Unit**

3.     JG assaulted Booker on the morning of November 13, 2016 while Booker was sitting on the toilet. Ex. 2, Booker Dep. (33:23 to 35:19).

4.     Correction officers were not present in the bathroom when the assault occurred, but officers were "in the vicinity." Ex. 2, Booker Dep. (34:20 to 22). Booker is unaware whether Sgt. Hierholcer was present. Id. (36:21 to 24).

5.     Booker did not inform staff of the assault by JG. Second Am. Compl. ¶ 6 (Doc. #20). After he was assaulted later in the day by a second individual, JN, Booker was sent to the Delta Unit, an "infirmary/detox" unit, where he told a nurse about the earlier assault by JG. Id.

6.     Sgt. Hierholcer later encountered JG, who was then being held in a cell on the Delta Unit. Sgt. Hierholcer issued a report after JG "made a statement that if the administration didn't get Booker out of there, there was going to be problems." Sgt. Hierholcer also notified Sgt. Murphy, who was the officer in charge on Delta Unit, and also the Shift Commander. Sgt. Hierholcer wrote the report to inform staff at the morning meeting so that they could ensure that Booker and JG "don't come across each other." Ex. 1, Hierholcer Dep. (12:21 to 15:16; 20:10-13).

**Facts Pertaining to the November 13, 2016 Assault by JN in the Alpha Unit**

7.     While Booker sat on his bed, JN ran into him and "speared" Booker in his chest. Officers responded right away. Ex. 2, Booker Dep. 42:5 to 43:3; 44:15-22. Prior to the assault, Booker had "no incidents" with JN who was "was all right." Booker would "just pass by him." Booker attributes the assault to a "bounty" being placed on his head. Id. (39:16 to 41:8).

**Facts Pertaining to the November 16, 2016 Assault by DD in the Delta Unit**

      8.     DD's assault on Booker was sudden and unforeseen. DD had not previously bothered Booker, and the assault was "more than a surprise" to Booker. Ex. 2, Booker Dep. (17:7 to 19:5) Booker describes the event as follows:

> I won't necessarily call him a gentleman but the young man seemed like he was friends with me. Right?  Not like, you know, anything.  We were just like "How is it going?" You know, this and that, everything.  Then one day he was on the phone. I was on the bunkbed, the top, and the food was coming out, which was horrible.  I just wanted to see what slop they were going to throw at us today. He worked for them.  He worked serving the food. So I asked him, and he said "It is right over there.  Go look."  So I got up.  And I guess he imagined that I was in his view, as he is on the phone, of the TV.  And he said "Move out of the way."  He said "You are in the way of the TV."  And I said "Hold on one second, cuz."  I said "Give me one second, cuz.  It is a commercial on anyway." Next thing I know, out of nowhere he comes and punches me in the face and blood just started pouring everywhere.  And I never like put my hands back on him.  I never touched him, nothing.  It just came out of -- I wasn't even looking at him.  It just came out of like -- as far as where my lawyer is sitting, I would be like right here, looking this way at the food, and then out of nowhere -- it just came out of nowhere.  I was bent over and blood just started pouring everywhere.

Id. (11:21 to 12:22).

      9.     At the instant DD assaulted Booker, Sgt. Hierholcer was present in the Delta 2 Unit, but he was not situated in physical proximity to Booker and DD. Sgt. Hierholcer was sixty feet away from Booker when the assault occurred. Ex. 1, Hierholcer Dep. 19:20 to 22:16). Sgt. Hierholcer

> was making rounds on the side of the Delta Unit that Booker was housed in. And I'm walking towards the bathroom, and I'm almost going into the bathroom door, and I heard two civil commitments start to argue. So I turned around, and I saw Booker state, You can't hit me. And another civil commitment struck him with a closed fist in the cheek.

Id. (19:20 to 20:3)

      10.    At the time of the assault, Sgt. Murphy and a third officer were in the officers' station. Ex. 1, Hierholcer Dep. (20:8-13). Sgt. Hierholcer went over and called Sgt. Murphy on the radio, who then responded. Id. (21:9-12). Sgt. Hierholcer described the scene:

> It was one punch; they weren't fighting anymore. Booker was holding his face. The other kid was just running his mouth. And we separated them and put them in cells, and we had medical attend to both of him.

Id. (21:13-17)

11.     While he was bent over after the assault, Booker observed Sgt. Hierholcer arrive

from the bathroom at the opposite end of the unit:

> I do remember when I was bent over, one of the officers was just -- I remember specifically he had already come out of -- down here, there's a bathroom right here.

> Q.  You are showing the opposite end of the dorm?

> A.  Yes.  There's a bathroom here.  As I am right there, I had like turned my head and the officer was no more than right here and he was just like walking -- he didn't care.

Booker Dep. Ex. 2 (25:9 to 25:18).

## Facts Pertaining to Individual Safety

12.     MASAC had three housing units, named Alpha, Bravo and Delta. Alpha tended to

house the more aggressive, younger individuals. Bravo tended to house older individuals and

young individuals without a criminal record. The Alpha Unit was generally more active and

Bravo more quiet. Ex. 3, Cowen Dep. (30:14 to 31:5); Ex. 4, Dantuono Dep. (33:8 to 34:21). The

Delta Unit housed individuals who were detoxing, who were medically compromised, or who

required additional safety. The Delta Unit was similar to the other units in that it was an open

bunked unit. Delta had medical staff and three correction officers assigned. Ex. 3, Cowen Dep.

(14:22 to 15:13; 31:6-9). The Alpha Unit was staffed by two correction officers and no medical

staff. Ex. 3, Cowen Dep. (16:2-5); Ex. 4, Dantouno Dep. (33:13-8). The Delta Unit was also the

only unit with individual cells, two single and two double. Ex. 3, Cowen Dep. (16:9-17).

13.     If staff knew that individuals were "enemies," the individuals were not placed in

the same unit. Ex. 4, Dantuono Dep. (34-22 to 35:2); Ex. 3, Cowen Dep. (30:14 to 31:5).

Individuals also could be placed on different sides of a unit to separate them from each other. Ex. 4, Dantuono Dep. (38:1-4).The decision to move an individual to a different unit would be made by the deputy superintendent, the director of security, or the shift commander. Where an issued occurred between two individual requiring their separation, the Inner Perimeter Security ("IPS") officer would interview them individually and offer them waivers to sign if they indicated that the issue had been resolved. If so, they would be returned to population. Id. (37:3 to 37:24). If an individual refused to sign a waiver or indicates that there is an ongoing problem, he would be kept in a cell until further investigation occurs. Id. (38:6-21).

14.     When an individual committed to MASAC, the obligation was to get him treatment. Ex. 3, Cowen Dep. (31:10-17). After the individual underwent detoxification, there were phases of treatment. MASAC would consider discharge after the individual completed Phase I if there was a good community treatment program and housing for him. Id. (11:10-15; 12:16 to 13:9).

14.     Individuals who are civilly committed to MASAC may not want to be there and may do anything to leave. Id. (11:8-10). Simply releasing individuals who engaged in inappropriate behavior would make the facility less safe for staff because it would encourage others to do the same thing. Id. (11:22 to 12:8) It would also defeat the goal of proving treatment. Id. (11:10-15).

15.     MASAC tried to keep Booker, but for safety reasons, discharged Booker after the third fight before Booker had completed Phase 1. Id. (12:9 to 13; 31:10-17).

16.     Deputy Superintendent Alden Cowen was the Acting Superintendent of MASAC during Booker's civil commitment. Id. (6:23 to 7:2; 8:9 to 8:12). Deputy Superintendent Cowen reviewed Booker's case after the first two fights. Id. (10:12-19). On Sunday, November 13,

2016, Booker was moved from Alpha to a secure cell in Delta. Id. (22:11 to 23:6). Deputy Superintendent Cowen recalls having spoken with Booker in Delta while doing rounds. Id. (13:22 to 14:21; 16:18 to 17:1). At the "morning meeting" on November 14, 2016, MASAC staff discussed keeping Booker in Delta in order to separate Booker from the two individuals with whom Booker had a "conflict." Id. (17:4 to 18:6; 36:14 to 37:3). Booker acknowledges he was moved from Alpha to Delta for his safety:

> After being assaulted multiple, multiple times and then I was sent to the Delta Unit basically to keep me away from like the other people because those were the new ones that were just coming in and I guess from the rumblings, listening to people, I was labeled a "snitch." I was labeled basically the "N" word. I was labeled every single nasty, derogatory situation that you could imagine.

Ex. 2, Booker Dep. (11:12 to 11:20). On November 14, 2016, Booker was moved from the cell to bed 41 in Delta. Ex. 4, Cowen Dep. (23:7 to 15).

17.     A few days after the assault by DD on the Delta Unit, Booker was discharged from MASAC. Deputy Superintendent Cowen and two others conducted a review. Because Booker had not completed Phase I, Deputy Superintendent Cowen had to request a discharge review by the program director. Deputy Superintendent Cowen suggested Booker be discharged for his own safety. Ex. 4, Cowen Dep. (28:5 to 29:10). As there was no court or mental health "hold," Booker was discharged to the community with a treatment plan and a housing plan. Id. (29:11 to 30:8)

## ARGUMENT

## I.     SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed.R.Civ.P. 56(c). "'[G]enuine' means that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a 'material fact' is one which 'might affect the outcome of the suit under the governing law.'" <u>Koran v. Weaver</u>, 482 F.Supp.2d 165, 168 (D.Mass. 2007), citing <u>Buchanan v. Maine</u>, 469 F.3d 158, 166 (1st Cir.2006) (quoting <u>Seaboard Sur. Co. v. Town of Greenfield</u>, 370 F.3d 215, 218-219 (1st Cir.2004)). "To succeed [on a motion for summary judgment], the moving party must show that there is an absence of evidence to support the non-moving party's position." <u>Rogers v. Fair</u>, 902 F.2d 140, 143 (1st Cir.1990); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d 32, 37 (1st Cir. 1995), citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." <u>Rogers</u>, 902 F.2d at 143 (quoting <u>Anderson</u>, 477 U.S. at 249-50) (citations in <u>Anderson omitted</u>). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." <u>Barbour</u>, 63 F.3d at 36.

## II.   THERE IS NO DISPUTE AS TO MATERIAL FACTS, AND SGT. HIERHOLCER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

Booker's claim against Sgt. Hierholcer is analyzed under the substantive due process clause of the Fourteenth Amendment, which guarantees civilly committed patients "the right of personal security" and the right to conditions of reasonable safety." <u>Alves v. Murphy</u>, 530 F.Supp.2d 381, 386 (D.Mass. 2008) (quoting <u>Youngberg v. Romeo</u>, 457 U.S. 307, 315, 324

(1982)). It is recognized however, that the right to safe conditions is "not absolute." Id. (quoting

Youngberg, 457 U.S. at 320).

Because the "protection of civilly committed persons rests on due process concepts rather

than the Eighth Amendment," Battista v. Clarke, 645 F.3d 449, 452 (1st Cir. 2011), Booker is

not entitled to proceed under the Eighth Amendment, although, the "two standards are not all

that far apart…" Id.; Ruiz-Rosa v. Rullman, 485 F.3d 150, 155 (1st Cir. 2007) ("Generally, the

standard applied under the Fourteenth Amendment is the same as the Eighth Amendment

standard.") Both prison inmates and civilly committed individuals are entitled to protection from

harm by others. See Davis v. Rennie, 264 F.3d 86, 97-98 (1st Cir. 2001), cert. denied, 535 U.S.

1053 (2002).The constitutional standards differ in the standard by which a defendant's response to

his constitutional obligation is measured. In Farmer v. Brennan, 511 U.S. 825 (1994), a suit arising

from a sexual assault on a transsexual prison inmate, the Supreme Court defined the standard of

proof for prison inmate suits alleging that officials violated the Eighth Amendment by failing to

prevent violence by other inmates.

> [A] prison official cannot be found liable under the Eighth Amendment for denying an
> inmate humane conditions of confinement unless that official *knows of and disregards an*
> *excessive risk* to inmate health or safety; the official must both be aware of facts from which
> the inference could be drawn that a substantial risk of serious harm exists, and he must also
> draw the inference.

Farmer, 511 U.S. at 837. (Emphasis added). To survive summary judgement, a prison inmate

alleging deliberate indifference to his safety "must come forward with evidence from which it can

be inferred that the defendant-officials were…knowingly and unreasonably disregarding an

objectively intolerable risk of harm..." to the inmate. Id. at 846. In contrast, Fourteenth Amendment

substantive due process claims against "professional decision makers" generally turn on whether

"the defendant failed to exercise a reasonable professional judgment." Battista, 645 F.3d at 452,

citing <u>Youngberg,</u> 457 U.S. at 321.[2] Nonprofessional employees who provide care for involuntarily committed individuals may be subject to a "deliberate indifference" standard, <u>Id.</u>, but this is not always the case. Failure-to-protect claims of civilly committed individuals may be analyzed under different standards in institutional settings. <u>Alves</u>, 530 F.Supp. at 387. For example, mental health workers who failed in their duty to intervene to protect an involuntarily committed mental health patient being beaten by another mental health worker were not entitled to deliberate indifference instructions where the circumstances of the case rendered this standard an "awkward fit." <u>Davis v. Rennie</u>, 264 F.3d 86, 101-102 (1st Cir. 2001), cert denied, 535 U.S. 1053 (2002). "As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical." <u>Id</u>. (quoting <u>Farmer</u>, 511 U.S. at 851). Accordingly, the jury was instructed to apply "objectively reasonable" standard to assess the defendants' responses to their constitutional obligations to protect the civilly committed plaintiff.

Whether the situation occurs in prison inmates or in a facility for civilly committed individuals, an officer who is present at the scene may be held liable for his nonfeasance only if he fails to take reasonable steps to protect the victim. <u>Davis v. Rennie</u>, 264 F.3d at 98, citing <u>Gaudreault v. Municipality of Salem</u>, 923 F.2d 203, 207 n.3 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991). An "officer cannot be held liable for failure to intercede if he had 'no realistic

---

[2] "Professional decisionmakers" are defined as:

> [P]erson[s] competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons.

<u>Shaw v. Strain v. Strackhouse</u>, 920 F.2d 1135, 1146-47 (3rd Cir. 1990) (quoting <u>Youngberg</u>, 457 U.S. at 323 n. 30).

opportunity' to prevent an attack." <u>Gaudreault</u>, 923 F.2d at 207 n.3 (quoting <u>O'Neill v. Krzeminski</u>, 839 F.2d 9, 11-12 (2d Cir. 1989)). The officer must be aware of the situation, and for there to be a realistic opportunity to intervene, the officer must have had sufficient opportunity and time to intercede, and he must have been capable of preventing the harm.

It is undisputed that Sgt. Hierholcer lacked a realistic opportunity to prevent or intercede in DD's unforeseen and sudden assault. According to Booker, DD had not previously bothered Booker; rather, DD seemed like he was a friend. DD's assault was "more than a surprise." Booker Dep. (17:7 to 19:5). Booker recalled, "Next thing I know, out of nowhere he comes and punches me in the face and blood just started pouring everywhere." <u>Id</u>. (11:21 to 12:22).

At the instant DD assaulted Booker, Sgt. Hierholcer was present in the Delta 2 Unit, but he was not situated in physical proximity to Booker and DD. Sgt. Hierholcer reports that he was making rounds and about to enter the bathroom sixty feet away from Booker and DD: He testified:

> And I'm walking towards the bathroom, and I'm almost going into the bathroom door, and I heard two civil commitments start to argue. So I turned around, and I saw Booker state, you can't hit me. And another civil commitment struck him with a closed fist in the cheek.

<u>Id</u>. (19:20 to 20:3). Booker confirms Sgt. Hierholcer's location. While bent over after the assault, Booker observed Sgt. Hierholcer arrive from the bathroom at the opposite end of the unit. <u>Id</u>. (25:9 to 25:18).[3]

---

[3] Booker also testified that officers were present in the Delta Unit at the time of the assault, but he placed them approximately fifteen feet away. Ex 2, Booker Dep. (25:1-9). Contrary to his testimony that Sgt. Hierholcer had arrived on the scene from the bathroom area, Booker also claimed that Sgt. Hierholcer was situated near a food cart at the time of the assault. <u>Id</u>. (28:24 to 29:4). By either version of Booker's recollection, Sgt. Hierholcer was not situated directly adjacent to Booker when DD suddenly assaulted Booker, and therefore, Sgt. Hierholcer was never presented with a realistic opportunity to prevent or intervene.

Even though Sgt. Hierholcer lacked any realistic opportunity to prevent or to intervene in DD's sudden and unforeseen assault, Booker attempts to pin the blame on him by alleging that MASAC correction officers had a "custom" of allowing inmates to "fight it out" in order to settle disputes and punish inmates perceived to be snitches. Compl._¶ 9. Booker alleges that Sgt. Hierholcer allowed DD to attack him because Booker was perceived to be a snitch. Id. In reply to counsel's request for his evidence that Sgt. Hierholcer allowed DD's assault, Booker testified that officers gave "special treatment" and extra food to the individual who cleaned the offices and instructed them to assault those who vomited or soiled themselves. Booker Dep (53:5 to 55:10). Booker testified:

> Q.  And you heard Officer Hierholcer say that?
> A.   I've heard every one of them say that, yes, and he is included.  That was no secret because I was in that unit.  The first unit when they come in, that's when the new people walk in the door.
> Q.  The Delta Unit?
> A.  The Delta Unit, right.  I was in there four times.  Right?

Booker Dep. (55:11-18). Booker insisted that Sgt. Hierholcer was more involved than any other officer, even though Sgt. Hierholcer had worked in the Delta Unit only on two dates during Booker's admission, November 14 and 16:

> Yes.  I have heard every single one of them, including him, probably even more than anyone else, constantly repeat you get free stuff, like food, cookies.  That was like the biggest thing. When they had cookies or something like that, people went crazy.  Right?  And they would have bags of all of the cookies, right, the officers would, and they would be like, you know, "Kick his ass."  They constantly tried to incite violence.  It was a big joke.

Booker Dep. (55:18 to 56:3). Despite his claims that he encountered Sgt. Hierholcer on each of his MASAC admissions (Booker Dep. (30:21 to 31:10)), that Sgt. Hierholcer had called him "pretty Booker" while his "face was hanging off" following DD's assault (Booker Dep. 29:19 to 31:1), and that Sgt. Hierholcer had called him a "moron" because his name was "Amory," (Booker Dep. (30:16 to 31:7)), Booker could not describe the Sergeant, but he was sure that he would recognize a

photo. Booker Dep. (28:11-22). Booker was unaware whether Sgt. Hierholcer was present when he

was assaulted by JG in the Alpha Unit bathroom (Booker Dep. (36:21 to 36:23). He could say only

that Sgt. Hierholcer "possibly could have" been involved when officers on the Alpha unit allegedly

let an individual "go home" as a reward for spitting in Booker's face in front of the "security box"

where the officers were situated. Booker Dep. (46:3 to 49:20).

Putting aside Booker's uncertain testimony about the officers, Booker's description and

understanding of DD's assault entitles Sgt. Hierholcer to summary judgment. Booker confirms that

this assault had no connection to his alleged labeling as a snitch, and therefore, no connection to his

allegations against Sgt. Hierholcer or any other officer. The alleged "snitch" issue never arose:

> Spoke with [DD], yes.  He didn't seem – to put it blunt, you know, people would be calling
> me snitches and rats and all kinds of stuff, but he never really said anything to me about that.
> He didn't come off to me -- we didn't have like a friendship relationship, you know.  He'd
> just be at the phone.  My bed would be right there.  He would come over and give me my
> tray of food and be "How is it going?"  I'd just be right there.  He didn't seem like a threat.
> He didn't pose a threat to me.

Booker Dep. (17:21 to 18:6). DD assaulted Booker because Booker blocked DD's view of the

television:

> Then one day he was on the phone. I was on the bunk bed, the top, and the food was coming
> out, which was horrible.  I just wanted to see what slop they were going to throw at us today.
> He worked for them.  He worked serving the food. So I asked him, and he said "It is right
> over there.  Go look."  So I got up.  And I guess he imagined that I was in his view, as he is
> on the phone, of the TV.  And he said "Move out of the way."  He said "You are in the way
> of the TV."  And I said "Hold on one second, cuz."  I said "Give me one second, cuz.  It is a
> commercial on anyway." Next thing I know, out of nowhere he comes and punches me in
> the face and blood just started pouring everywhere.  And I never like put my hands back on
> him.  I never touched him, nothing.  It just came out of -- I wasn't even looking at him.

Booker Dep. (12:1-17).

## CONCLUSION

The undisputed material facts concerning Booker's assault by DD, including the material facts set forth in Booker's sworn testimony describing his assault by DD, in conjunction with all reasonable inferences therefrom that may be drawn in Booker's favor, establish the following:

1.     DD's sudden and unforeseen assault of Booker had no factual connection to and does not support Booker's allegations that "the correctional officers at MASAC had a custom of allowing inmates to "fight it out" in order to settle disputes and punish inmates perceived to be snitches," and that "Defendant Hierholcer allowed CC DD to attack Booker because he was perceived to be a snitch; and

2.     Sgt. Hierholcer had no realistic opportunity to prevent or to intervene in DD's sudden and unforeseen assault.

Because Booker lacks the evidence to prove the essential elements of his Fourteenth Amendment claim against Sgt. Hierholcer, Sgt. Hierholcer is entitled to summary judgment as a matter of law.

Dated: August 7, 2018          Respectfully Submitted,

Robert Hierholcer,
By his Attorneys,

NANCY ANKERS WHITE
Special Assistant Attorney General

/s/ William D. Saltzman
William D. Saltzman
BBO No. 439749
Department of Correction
70 Franklin Street, Suite 600
Boston, Massachusetts 02110-1300
(617) 727-3300, Ext. 1154
william.saltzman@massmail.state.ma.us

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(A)(2)**

       I, William D. Saltzman, counsel for the defendants, hereby certify that I have conferred with counsel for the plaintiff, pursuant to Local Rule 7.1(A)(2).

**CERTIFICATE OF SERVICE**

       I, William D. Saltzman, counsel for defendant Sgt. Robert Hierholcer, hereby certify that on this 7th day of August, 2018, I did serve this document through the Court's electronic filing system (ECF) on all persons so registered.

                            /s/ William D. Saltzman
                            William D. Saltzman